WAGNER (GARDENER v.). See Case No. 5,218.

# Case No. 17,039.

## WAGNER v. The JUANITA.

[Newb. 352.] [1]

District Court, E. D. Louisiana. Nov., 1846.

WAR—CONFISCATION OF ENEMY PROPERTY—LEGISLATIVE AND JUDICIAL FUNCTIONS.

1. Enemy property found within our territory on the breaking out of war, cannot be confiscated without an act of congress authorizing such confiscation.

2. When war breaks out, the question, what shall be done with enemy property in our country, is a question rather of policy than of law. The rule which we apply to the property of our enemy, will be applied by him to the property of our citizens. Like all questions of policy, it is one proper for the consideration of the legislative department of the government, not of the executive or judiciary.

3. There being nothing in the act of congress recognizing the existence of war between the United States and Mexico, which authorizes the confiscation of the property of the enemy found within our territory upon the breaking out of the war, this court has no power to confiscate such property.

In admiralty. .

Mr. Wilde, for plaintiff.

Mr. Benjamin, for respondent.

McCALEB, District Judge. The libelant [W. F. Wagner] in this case alleges, that actual hostilities having been committed upon the United States by the republic of Mexico, and a state of war existing between the two countries, the schooner Juanita, being a Mexican vessel, owned in whole or in part by citizens of Mexico, together with her cargo, tackle and apparel, likewise the property of citizens of Mexico and enemies of the United States, are in the port of New Orleans, and within the jurisdiction of this court: that said schooner with her cargo, was proceeding to the port of Matamoras within the Mexican republic, when they were taken possession of by an officer and men from the United States schooner Flirt, and ordered to New Orleans; the captain and several or all of the crew of the Juanita, being brought on board of the Flirt to this port.

The libel further alleges, that the Juanita was commanded by one Francisco de Asteguia, as master, and navigated by a crew of nine men, mariners, citizens of Mexico, and that she and her cargo being property of citizens of Mexico, are good prize of war: that she was at the time of her seizure proceeding with her cargo, consisting of provisions, ammunition and munitions of war, to the relief of Matamoras, then in a state of blockade by the forces of the United States: that since her arrival in the port of New Orleans, her cargo has been transshipped on board of other vessels in this port, but about to sail immediately for places unknown to the libelant: that the United States schooner Flirt, after remaining

in the port of New Orleans several days, sailed on a cruise, and that no proceedings whatever were instituted on behalf of the original captors: that the Juanita has been libeled in this court on the instance side thereof in admiralty, upon a pretended claim of Francisco Tio for advances and repairs. The libel then concluded with a prayer for process against the vessel, cargo and apparel, and for their condemnation as prize.

A claim and answer is filed by Francisco Tio, who denies the right of the marshal to act in behalf of the United States, and alleges that he (the claimant) is a citizen of the United States: that he has for a long time past, been in commercial correspondence with José Lopez a subject of the queen of Spain, and vice-consul of her majesty for the port of Matamoras; and that in the months of December and January last, he was the consignee in New Orleans, of the schooner Juanita; and at the request of said Lopez, who was the consignor, advanced various sums of money for the expenses, repairs and refitting of the schooner, as the whole is fully detailed in his libel filed in this court. He further alleges, that by various letters received by him from Lopez, bearing date at Matamoras on the 19th of February, and 2d, 3d and 5th of March last, the purchase of a cargo was requested by said Lopez to be made on his account, to be shipped by the respondent to Matamoras; and the respondent was requested to advance the price of the merchandise upon the promise of Lopez to reimburse the same on the arrival of the goods at the port of destination: that accordingly he purchased merchandise · to the value of $7,000, and caused it to be shipped on board the Juanita, and obtained insurance upon it in his own name and for whom it might concern, in the office of the general mutual insurance company in New York: that the schooner thus laden, was duly cleared at the custom-house in this city, and departed on her voyage for Matamoras. He further alleges that at the time of her departure and long afterwards, peace existed · between the United States and Mexico, and the voyage was in all respects open, public and lawful: that on the 11th of April, the schooner arrived off Brazos St. Jago, and was detained several days in endeavoring to cross the bar, in the vicinity of Point Isabel, where certain forces of the United States, both naval and military, were stationed: that on or about the 25th of April, the commanding officer of these forces sent an officer and soldiers on board the schooner to examine her manifest, and instructed the soldiers to remain on board; and the schooner was thus detained until the 5th of May, when by permission of General Taylor, the commander in chief, the soldiers were withdrawn and the schooner was permitted to return to New Orleans, where she arrived on or about the 13th of May; and after duly reporting at the custom-house, was permitted to discharge her cargo. He alleges that upon the return of the schooner and the breaking up

---

[1] [Reported by John S. Newberry, Esq.]

of the voyage by the causes here detailed, he determined to abandon the adventure, and accordingly ordered the discharge of the schooner, and caused the cargo to be landed and stored partly in the custom-house and partly in public stores, and resumed possession of the goods as owner: that he also filed his libel against the schooner ·on the instance side of this court, to recover the amount of his charges and disbursements: that the marshal of this court well knew the premises, and was in the actual possession of the schooner, her tackle and apparel, in his official capacity, under the process issued at the instance of him (the respondent) when he caused the libel in this cause most unjustly to be filed.

The respondent most positively denies, that the cargo belonged to any citizen of Mexico; and that the schooner was captured by the forces of the United States. He denies that the captain and crew were brought to New Orleans, on the Flirt, or that the cargo consisted of ammunition or munitions of war, or that said cargo was intended for the relief of Matamoras. He denies that that port was on the arrival of the schooner at the Brazos St. Jago, in a state of blockade, or that any blockade had been declared. He denies that any part of the cargo was shipped on other vessels to be sent away. He maintains that· his claims against the Juanita for which his libel was filed, are just and legal, and avers that the restraint and detention of the authorities of the United States, ceased entirely on the 5th of May, and that the schooner returned to the port of New Orleans under the control of her own officers and crew, free of any further restraint. He also avers, that the voyage and adventure were in all respects peaceable and lawful: that it commenced during the continuance of peace, and the arrest, detention and return of the schooner, occurred before hostilities had been declared or commenced: that his proceedings after the return of the schooner, were open, public, and notorious, and in every respect lawful and just, while the proceedings of the marshal have been wholly unwarranted, unfounded and illegal. He therefore prays for a restitution of the· cargo and for permission to prosecute, without further hindrance, his· claim for repairs and advances, on the instance side of the court.

A replication to this answer and claim, was filed on the part of the libelant, alleging that the respondent by his own showing, admits, that the seizure of the schooner by the United States force, was abandoned, and therefore it can in no wise interfere with, or prevent the present subsequent seizure, or affect the rights of libelant under the same. It avers that the pretended claim of the respondent, is unfounded in law and fact, and absorbed and destroyed by the law of war: that a blockade was rigorously enforced at the time the Juanita arrived off the Brazos St. Jago. It further avers, that the answer is evasive and disingenuous, in not stating the national character of the vessel, and in not stating whether the cargo did at the time of shipment and at the time of capture, belong to the claimant.

As cases of this kind are new in this court, I have considered it due to the parties in this action, to set forth distinctly the grounds upon which each has rested his claims for a favorable decision. It will be apparent, however, from the ·facts·developed upon the trial, that many points have been presented by the pleadings and discussed in argument, which are not material to a correct conclusion. The most important allegations in. the libel are not sustained by those facts. There was indeed a seizure of the vessel at the mouth of the Rio Grande, by the forces of the United States there stationed, but as appears by the admission in both the answer and the replication, that seizure was abandoned. The Juanita, therefore, did not return to the port of New Orleans in charge of the Flirt, as alleged in the libel, but under the control of her own master and crew.

It is due to the claimant that I should state that, after an attentive examination of the evidence, I have not been able to satisfy my mind that there has been anything unfa·: or improper in his conduct. There is nothi·e in the papers of the vessel, against which this proceeding has been instituted, that implicates him in a transaction at all inconsistent with fair dealing, or the rules which govern an open and honest commercial intercourse. His correspondence with his consignor, has disclosed nothing like a fraudulent design to carry on a contraband or other trade with an enemy. He seems simply to have acted in accordance with his instructions, in the purchase and shipment of the cargo, and at a time when it does not appear that war prevailed between this country and Mexico. It is not proven that at the time he cleared the vessel for Matamoras, that port was in a state of blockade, nor does it appear that any blockade was declared or enforced until after the arrival of the vessel off Brazos St. Jago. His answer is not as explicit as it should be on the subject of the national character of the vessel, but as it was made under oath, and contains so full, and what appears to me, so candid a statement of the official character of his consignor, and the relations which existed between that person and himself, that I do not feel myself at liberty to presume that his omission to give the national character of the vessel, was prompted by a willful design to evade. when perhaps he was ignorant of the true owners. But regarding the omission in the light ·of an evasion, I can only give the 'libelant the full benefit of it. by considering it as an admission of the fact that the vessel was Mexican property, a fact. in my opinion, sufficiently proven by the testimony elicited by the examination in preparatorio.

Proceeding upon the assumption that hostilities commenced between the American and Mexican forces after the arrival of the vessel off the Brazos, and that war existed at the time she was seized by order of the commanding general, I need not inquire how far this

court would have been compelled to proceed to condemnation under that seizure, if those who made it had chosen to prosecute to an adjudication. That question cannot arise in the cause. We have seen that the seizure was merely temporary. The schooner was released, and permitted to return to this port. She was found here when the libel in this case was filed, and when the act of congress recognizing the existence of the war was passed, and the proclamation of the president on the subject was received. Admitting, then, that both vessel and cargo belonged to Mexican citizens, and became enemy property on the breaking out of the war, the only question which can arise is that which has already received the consideration of the supreme court of the United States, to wit: Can enemy property, found within our territory at the breaking out of war, be confiscated by a judgment of this court without an act of congress authorizing a confiscation? So far as the cargo in this case is concerned, this cannot be considered an open question. There is no doubt that when the libel was filed the cargo had been landed; and in the case of Brown v. U. S., 8 Cranch [12 U. S.] 110, the very questions at issue were: 1st. May enemy property, found on land at the commencement of hostilities, be seized and condemned, as a necessary consequence of the declaration of war? 2d. Is there any legislative act which authorizes such seizure and confiscation?

Both these questions were answered in the negative by the court, and although the reasoning of Chief Justice Marshall, who delivered the opinion, was directed to the questions here stated, the principles of law which he has recognized as rules of decision in cases of this nature, are believed to be sufficiently broad to cover the case of vessels found in our ports at the breaking out of war. "Respecting the power of government," say the court, "no doubt is entertained. That war gives to the sovereign full right to take the persons and confiscate the property of the enemy, wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will. Since, in this country, from the structure of our government, proceedings to condemn the property of an enemy found within our territory at the declaration of war, can be sustained only upon the principle that they are instituted in execution of some existing law, we are led to ask, is the declaration of war such a law? Does that declaration, by its own operation, so vest the property of the enemy in the government as to support proceedings for its seizure and confiscation, or does it vest only a right, the assertion of which depends on the will of the sovereign power? The universal practice of forbearing to seize and confiscate debts and credits, the principle universally received, that the right to

them revives on the restoration of peace, would seem to prove that war is not an absolute confiscation of this property, but simply confers the right of confiscation. Between debts contracted under the faith of laws, and property acquired in the course of trade on the faith of the same laws, reason draws no distinction. Although, in practice, vessels, with their cargoes, found in port at the declaration of war, may have been seized, it is not believed that modern usage would sanction the seizure of the goods of an enemy on land, which were acquired in peace, in the course of trade. Such a proceeding is rare, and would be deemed a harsh exercise of the rights of war. But although the practice in this respect may not be uniform that circumstance does not essentially affect the question. The inquiry is whether such property vests in the sovereign by the mere declaration of war, or remains subject to a right of confiscation, the exercise of which depends on the national will; and the rule which applies to one case, so far as respects the operation of a declaration of war on the thing itself, must apply to all others over which war gives an equal right. The right of the sovereign to confiscate debts, being precisely the same with the right to confiscate other property found in the country; the operation of a declaration of war on debts and on other property found within the country, must be the same."

After quoting the authority of Vattel, that "the sovereign can neither detain the persons nor the property of those subjects of the enemy who are within his dominions at the time of the declaration of war," the chief justice thus proceeds: "It is true that this rule is, in terms, applied by Vattel to the property of those only who are personally within the territory at the commencement of hostilities; but it applies equally to things in action and things in possession; and if war did, of itself, without any further exercise of the sovereign will, vest property of the enemy in the sovereign, his presence could not exempt it from this operation of war. Nor can a reason be perceived for maintaining that the public faith is more entirely pledged for the security of property trusted in the territory of the nation in time of peace, if it be accompanied by its owner, than if it be confided to the care of others. Chitty, after stating the general right of seizure, says: 'But in strict justice, that right can take effect only on those possessions of a belligerent which have come to the hands of his adversary after the declaration of hostilities.'" On this authority the supreme court remark: "The modern rule, then, would seem to be that tangible property, belonging to an enemy, and found in the country at the commencement of war, ought not to be immediately confiscated; and in almost every commercial treaty an article is inserted, stipulating for the right to withdraw such property. This rule appears to be totally incompatible with the idea that war does, of itself, vest the property in the belligerent government. It may be considered as the opinion of all who

have written on the jus belli, that war gives the right to confiscate, but does not, itself, confiscate the property of the enemy; and their rules go to the exercise of this right. The constitution of the United States was framed at a time when this rule. introduced by commerce, in favor of moderation and humanity, was received throughout the civilized world. In expounding that constitution, a construction ought not lightly to be admitted which would give to a declaration of war an effect in this country it does not possess elsewhere, and which would fetter that exercise of entire discretion respecting enemy property which may enable the government to apply to the enemy the rule that he applies to us. If we look to the constitution itself, we find this general reasoning much strengthened by the words of that instrument. That the declaration of war has only the effect of placing two nations in a state of hostility, of producing a state of war, of giving those rights which war confers; but not of operating, by its own force, any of those results, such as a transfer, which are usually produced by ulterior measures of government, is fairly deducible from the enumeration of powers which accompanies that of declaring war. "Congress shall have power"—"to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water." It would be restraining this clause within narrower limits than the words themselves import, to say that the power to make rules concerning captures on land and water is to be confined to captures which are ex-territorial. If it extends to rules respecting enemy property found within the territory, then we perceive an express grant to congress of the power in question, as an independent substantive power, not included in that of declaring war. The acts of congress furnish many instances of an opinion that the declaration of war does not, of itself, authorize proceedings against the persons or property of the enemy found at the time within the territory. War gives an equal right over persons and property; and if its declaration is not considered as prescribing a law respecting the person of an enemy found in our country, neither does it prescribe a law for his property. The act concerning alien enemies, which confers on the president very great discretionary powers respecting their persons, affords a strong implication that he did not possess those powers by virtue of the declaration of war."

The court then examine the acts of congress relating to the war with Great Britain, and especially that by which war was declared with that country, and after quoting that portion which authorizes the president to issue to private armed vessels letters of marque and reprisal, it thus continues: "That reprisals may be made on enemy property found within the United States at the declaration of war, if such be the will of the nation, has been admitted; but it is not admitted that in the declaration of war the nation has expressed its will to that effect. It cannot be necessary to employ argument in showing that when the attorney for the United States institutes proceedings at law for the confiscation of enemy property found on land, or floating in one of our creeks, in the care and custody of one of our citizens, he is not acting under the authority of letters of marque and reprisal, still less under the authority of such letters issued to a private armed vessel."

It was urged in the case of Brown v. U. S., [supra], as well as in the case now under consideration by the proctor for the libelant, that in executing the laws of war the executive may seize and the courts condemn all property, which, according to the modern law of nations is subject to confiscation, although it may require an act of the legislature to justify the condemnation of that property, which according to modern usage, ought not to be confiscated. The language of the chief justice in answer to this argument is too strong and explicit to be misunderstood. "This argument," says he, "must assume for its basis the position that modern usage constitutes a rule which acts directly upon the thing itself by its own force, and not through the sovereign power. This position is not allowed; this usage is a guide which the sovereign follows or abandons at his will. The rule like other precepts of morality, of humanity, and even of wisdom. is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet it may be disregarded. This rule is in its nature flexible; it is subject to infinite modification. It is not an immutable rule of law, but depends on political considerations which may continually vary. Commercial nations in the situation of the United States, have always a considerable quantity of property in the possession of their neighbors. When war breaks out, the question, what shall be done with enemy property in our country? is a question rather of policy than of law. The rule which we apply to the property of our enemy, will be applied by him to the property of our citizens. Like all other questions of policy, it is proper for the consideration of a department which can modify it at will; not for the consideration of a department which can pursue only the law as it is written. It is proper for the consideration of the legislature, not of the executive or judiciary. It appears to the court, that the power of confiscating enemy property is in the legislature, and that the legislature has not yet declared its will to confiscate property which was within our own territory at the declaration of war." I make no apology for the copious extracts I have taken from this able and lucid opinion. As an exposition of the law, it is obligatory upon the tribunal, and settles all the material points of controversy in the case now under consideration. The remarks of the chief justice in exposing the want of authority in the district attorney to file a libel under the law of congress, declaring war with Great Britain, apply with full force to the libelant in the present action. The question how far a seizure of enemy property found on land upon the declaration of war,

can be made without an act of congress, has been determined in terms too clear to leave any doubt on the mind of the court; and the rights of the owner to the cargo of the Juanita, are fully established, even admitting that owner to be an enemy. In respect to the vessel herself, now in the port of New Orleans, I consider the reasoning of the court equally strong against the claim of the libelant; she is to all intents and purposes property as much infra-territorial, within the limits of the United States, as the cargo placed in store a few hundred yards from the shore where she is moored; and she can with no more reason be said to be beyond the territorial limits of the United States, than the river upon whose waters she is now floating.

It is not pretended that there is anything in the act of congress recognizing the existence of war with Mexico, that confers on this court the power to confiscate enemy property, found within our territory upon the declaration of war; and without such power, it is clear this seizure cannot be maintained. But it was contended by the learned counsel of the libelant in his concluding argument, that the decision of the supreme court of the United States, in the case of Brown v. U. S., was endered at a period when the law of prize was new in that court and its principles imperfectly understood; and that the rules therein recognized, are inconsistent with the principles laid down in subsequent decisions, which emanated from the same high tribunal, as well as the well established principles of the practice of the high court of admiralty, in England. In the course of my anxious investigation into the merits of this cause, I have looked in vain for any rule or principle in the decisions of the supreme court, subsequent to that of Brown v. U. S., which can justly be regarded as inconsistent with, or in anywise militating against their judgment previously rendered; on the contrary, I find in a decision by them subsequently rendered, a distinct recognition and affirmation of the principles which had been their guide in the case here relied on. That a different rule, so far as relates to vessels in port, prevailed in the high court of admiralty, in England. during the time the bench was occupied by Sir William Scott, seems to be admitted by the court, in the case of Brown, and must be evident to all who have examined the opinion of that eminent judge, in the case of The Rebeckah, 1 C. Rob. Adm. 227, and Id. 230, note. Whether this difference arose from a strong inclination on the part of Sir William Scott, in favor of captors, or a disposition on the part of our supreme tribunal to adhere closely to the provisions of a written constitution, and their forbearance to exercise power not delegated by the legislative department of the government, it is unnecessary for me to decide, but that the difference exists, is beyond a doubt. "I respect Sir William Scott," says Chief Justice Marshall, in delivering, not a dissenting, but a separate opinion, in the case of The Venus, 8 Cranch [12 U. S.] 299, "as I do every truly great man, and I respect his decisions; nor should I depart from them on light

grounds. but it is impossible to consider them attentively, without perceiving that his mind leans strongly in favor of captors. * * * In a great maritime country, depending on its navy for its glory and its safety; the national bias is perhaps so entirely in this direction, that the judge, without being conscious of the fact, must feel its influence. However this may be, it is a fact of which I am fully convinced, and on this account it appears to me to be the more proper to investigate rigidly the principles on which his decisions have been made, and not to extend them, where such extension may produce injustice."

The proctor of the libelant has also urged upon my attention the dissenting opinion of Mr. Justice Story, in the case of Brown v. U. S. Whatever may be my veneration for the memory of that illustrious jurist, whatever may be my respect for all that has emanated from his vigorous and comprehensive mind. and especially for the learning and ability he has displayed in the opinion he delivered in the very case referred to, it is unnecessary for me to say that I cannot permit his single dissenting opinion to operate as my guide in opposition to that of the majority of the court with Marshall at their head.

If the views of the court, conveyed in the lucid language of the venerable chief justice, require any confirmation, it will be found in the. excellent treatise of Wheaton on International Law (page 366): "As the property of the enemy is in general liable to seizure and confiscation as prize of war, it would seem to follow as a consequence, that the property belonging to him and found within the territory of the belligerent state, at the commencement of hostilities, is liable to the same fate with his other property, wheresoever situated. But there is a great diversity of opinion upon this subject among institutional writers, and the tendency of modern usage between nations seems to be, to exempt such property from the operations of war."

After a learned and able review of the opinion of Grotius, Bynkershoek and Vattel, the writer concludes: "It appears, then, to be the modern rule of international usage, that property of the enemy found within the territory of the belligerent state, or debts due to his subjects by the government, or individuals, at the commencement of hostilities, are not liable to be seized and confiscated as prize of war. This rule is frequently enforced by treaty stipulations, but unless it is thus enforced, it cannot be considered an inflexible though an established rule. 'The rule,' as it has been beautifully observed. 'like other precepts of morality, of humanity. and even of wisdom, is addressed to the judgment of the sovereign. It is a guide which he follows or abandons at his will; and although it cannot be disregarded by him without obloquy, yet it may be disregarded. It is not an immutable rule of law, but depends on political considerations, which may continually vary.' Among these considerations is the conduct observed by the enemy; if he confis-

cates property found within his territory, or debts due to our subjects, on the breaking out of war, it would certainly be just, and it may under certain circumstances, be politic to retort upon his subjects by a similar proceeding. This principle of reciprocity operates in many cases of international law."

The opinion of the supreme court of the United States, in the case of Brown v. U. S., is afterwards referred to and quoted at length as establishing the rule which prevails in our own country. If a different rule had been subsequently prescribed by the court itself, it would hardly have escaped the vigilant researches of the distinguished author.

For the reasons here given, I am clearly of opinion that the vessel and cargo should both be restored; and I do hereby decree restitution accordingly, without the payment of costs.